**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
PHILADELPHIA INDEMNITY INSURANCE        )
COMPANY, A/S/O 1441 RHODE ISLAND        )
AVENUE CONDOMINIUM ASSOCIATION,         )
                                        )    Civil Action
            Plaintiff,                  )    No. 15-765(EGS)
                                        )
        v.                              )
                                        )
LEND LEASE (U.S.) CONSTRUCTION,         )
INC.,                                   )
                                        )
            Defendant.                  )
_____)

## MEMORANDUM OPINION

In January 2014, a water sprinkler burst inside the condominium property located at 1441 Rhode Island Avenue, NW in the District of Columbia. The insurer of the 1441 Rhode Island Avenue Condominium Association ("Association"), plaintiff Philadelphia Indemnity Insurance Company ("Philadelphia Indemnity"), compensated the Association for its losses. Philadelphia Indemnity, as subrogee of the Association, then filed this action against defendant Lend Lease (U.S.) Construction, Inc. ("Lend Lease") for negligence due to its alleged faulty construction of the condominium building.

On March 18, 2016, the Court ordered limited discovery on the question of whether the Association should be deemed a successor of the building's original owner, Fairfield D.C.

Limited Partnership ("Fairfield"). *See Philadelphia Indem. Ins. Co. v. Lend Lease (U.S.) Constr., Inc.*, 170 F. Supp. 3d 190, 194 (D.D.C. 2016) ("March 18 Order"). The parties subsequently engaged in discovery on this limited issue. Lend Lease now moves for summary judgment on the ground that Philadelphia Indemnity's insured – the Association – is a successor of Fairfield, and therefore, Philadelphia Indemnity's action is barred by the waiver-of-subrogation clause contained in the contract between Lend Lease and Fairfield. *See generally* Def.'s Mot. for Summ. J., ECF No. 22. As set forth below, because a genuine dispute of material fact remains as to whether the Association is a successor to Fairfield, Lend Lease's motion for summary judgment is **DENIED**.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

---

[1]    Lend Lease appended its statement of undisputed material facts to its memorandum in support of its motion for summary judgment. Def.'s Mot. for Summ. J., Statement of Material Facts, ECF No. 22. In opposing Lend Lease's motion, Philadelphia Indemnity did not file a "separate concise statement" of "all material facts" that remain in dispute as required by Local Civil Rule 7(h)(1), but did assert certain facts with citations to the record in its opposition.

## A. The Contract

On June 19, 2002, Lend Lease[2] entered into a contract with Fairfield to construct a nine-story apartment building and refurbish an adjacent townhouse located at 1441 Rhode Island Avenue, NW. *See* Def.'s Mot. for Summ. J. Ex. A, Standard Form Agreement Between Owner and Contractor ("Standard Form Agreement") and General Conditions of the Contract for Construction ("General Conditions Contract") (collectively, "Contract"), ECF No. 22-3; Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 1, ECF No. 22; Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") at 2, ECF No. 23.

The General Conditions Contract contains a waiver of subrogation clause that provides that the Owner and Lend Lease "waive all rights" against one another "for damages caused by fire or other causes of loss to the extent covered by property insurance." General Conditions Contract ¶ 11.4.7. The General Conditions Contract also specifies that the waiver-of-subrogation applies to insurance policies purchased after the construction period. *Id.* ¶ 11.4.5. Finally, the General Conditions Contract includes a clause expressly stating that the contract "shall not be construed to create a contractual

[2] The contract was entered into by Bovis Lend Lease, Inc., a general contractor whose corporate name has since changed to Lend Lease (U.S.) Construction, Inc. *See* Def.'s SMF ¶ 1.

relationship of any kind . . . between any persons or entities other than the Owner and Contractor." *Id.* § 1.1.2. It creates an exception to this provision through the "Successors and Assigns" provision that states:

> The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents.

General Conditions Contract § 13.2.1. The first page of the Standard Form Agreement identifies Fairfield as the "Owner." Standard Form Agreement at 1.

### B. Sale of Property to 1441 LLC and Completion of Construction

In 2003, "about three quarters of the way into the project," Fairfield informed Lend Lease that it intended to sell the property to 1441 Rhode Island, LLC ("1441 LLC"), a limited liability company formed by Neil Gehani, Robert Berry, and Enrico Plati for the purpose of purchasing the property. Def.'s SMF ¶¶ 5-6, 8; Pl.'s Opp. at 2; Def.'s Mot. for Summ. J. Ex. B, Deposition of Kenneth O'Grodnick ("O'Grodnick Dep.") 13:15-20, ECF No. 22-4.

Fairfield and 1441 LLC entered into the initial Purchase and Sale Agreement on September 12, 2003. *See* Def.'s SMF ¶ 8; Pl.'s Opp. at 5. There is no evidence that any of the members of

1441 LLC received a copy of the Contract between Fairfield and Lend Lease either prior to or after the sale. *See* Pl.'s Opp. Ex. 6, Deposition of Robert Berry ("Pl.'s Berry Dep.") 114:19-22, ECF No. 23-6; Pl.'s Opp. Ex. 9, Deposition of Neil Gehani 40:22-41:2, 42:5-6, ECF No. 23-9; Def.'s Mot. for Summ. J. Ex. R, Deposition of Lawrence Bogard 17:11-17, ECF No. 22-20.

Fairfield and 1441 LLC closed on the property at the end of February 2004. *See* Def.'s SMF ¶ 9 (stating that property closing occurred on February 28, 2004); Pl.'s Opp. at 4 (stating that 1441 LLC became the deeded owner of the property on February 26, 2004). 1441 LLC's involvement with the property began prior to closing, when construction was "nearly complete." *See* Def.'s SMF ¶ 10. The parties dispute the level of involvement 1441 LLC had in the property during this period. According to plaintiff, 1441 LLC's involvement was "limited" to exercising "what ever rights Fairfield and Defendant saw fit to grant [it]," which only included participation in the "punch list process"[3] and nothing more. Pl.'s Opp. at 10-11. Lend Lease, on the other hand, contends that 1441 LLC took an "active role" in inspecting the property "in an effort to identify any 'imperfections' it wanted Lend Lease to fix." Def.'s SMF ¶¶ 9, 12-18. For example,

---

[3]     This is the process by which an owner "identifies any deficiencies" in the construction that the general contractor is required to fix before receiving final payment. Def.'s SMF ¶¶ 10, 19-20.

according to Lend Lease, as part of the punch-list process, a representative from 1441 LLC inspected each of the 157 condominium units in the building and, together with a representative from Fairfield, signed a "New Construction Interior Acceptance Letter" to confirm inspection and note any outstanding deficiencies. Def.'s SMF ¶¶ 12-18.

The Contract included a one-year warranty that was made to Fairfield. Def.'s SMF ¶ 25. Fairfield subsequently assigned its warranty rights to 1441 LLC. *Id.* ¶ 26; Pl.'s Opp. at 11 (agreeing that "1441 LLC acquired Fairfield's one-year warranty from [Lend Lease] by assignment"). The parties dispute the mechanism through which that one-year warranty was assigned. Plaintiff points to a copy of an agreement titled Assignment of Warranties and Other Contractual Rights ("Assignment Agreement"). Pl.'s Opp. at 11 (citing Def.'s Mot. for Summ. J. Ex. E, ECF No. 22-7). Lend Lease asserts that the assignment of warranty rights was made through a Public Offering Statement issued in connection with forming the condominium. Def.'s SMF ¶ 26.

The one-year warranty provision in the Contract obligated Lend Lease to "require each Subcontractor to assume the obligations [of the one-year warranty] at Subcontractor's sole cost and expense with respect to work performed by each Subcontractor." General Conditions Contract § 12.2.2.1. Because

1441 LLC was in the process of purchasing the building, all of
Lend Lease's subcontractors issued their standard one-year
warranties to 1441 LLC instead of Fairfield. Def.'s SMF ¶ 28;
Pl.'s Opp. at 11 (acknowledging that, "between December 18, 2003
and May 5, 2004, subcontractors issued one-year warranties on
Defendant form warranties listing the Property owner as B&P
Development, LLC" and that "B&P Development, LLC is a place
holder for 1441 LLC"). In addition, 1441 LLC paid Lend Lease
$40,846.71 for an extended warranty from each subcontractor.
Def.'s SMF ¶ 30; Pl.'s Opp. at 5 ("Prior to the expiration of
the one-year warranties under the contract between Fairfield and
Defendant, 1441 LLC purchased an extended warranty on April 14,
2004.").

On April 9, 2004, Fairfield made the final payment for
under the Contract to Lend Lease. Def.'s SMF ¶¶ 32-33; Pl.'s
Opp. at 5.

### C. Formation of the Condominium Association and Dissolution of 1441 LLC

In March 2004, 1441 LLC filed a Condominium Declaration
that ultimately formed the 1441 Rhode Island Avenue Condominium
and the related Condominium Association. Def.'s SMF ¶ 34; Pl.'s
Opp. at 6. The Condominium Bylaws were also filed at this time.
Pl.'s Opp. at 2. The Declaration and Bylaws together "conveyed
all of 1441 LLC's rights and responsibilities to the Unit Owners

7

Association." *Id.* Subsequently, the Association purchased property-damage insurance from plaintiff Philadelphia Indemnity. *Id.* at 2-3.

Both Mr. Gehani and Mr. Berry purchased condominium units in the building and, when the Association created a Board in July 2004, Mr. Gehani was elected as one of its five founding members. Def.'s SMF ¶¶ 35-36; Pl.'s Opp. at 6. According to the Association's representative, Mr. Gehani was elected in part because the Association thought it useful to have someone associated with 1441 LLC on the Board. Def.'s SMF ¶ 37; Pl.'s Opp. at 6 (conceding there was managerial overlap between 1441 LLC and the Association, but characterizing that overlap as "deminimis"). After Mr. Gehani sold his unit and resigned from the Board in the spring of 2006, he was immediately replaced by Mr. Berry, who served on the Board until June 2010. Def.'s SMF ¶¶ 36-39.

Because 1441 LLC had been created for the purpose of marketing, selling, and delivering the condominium units and then transitioning the property – and because those condominiums were sold "very, very quickly" – 1441 LLC's business was wrapped up by 2005. Def.'s SMF ¶¶ 55-56; Def.'s Mot. for Summ. J. Ex. D, Deposition of Neil Gehani 58:20-59:20, ECF No. 22-6. By January 28, 2006, 1441 LLC had been involuntarily dissolved. Def.'s SMF ¶ 56.

## D.  The Association's Management of the Building

As a member of the Association's Board, Mr. Berry served as the "middle man or intermediary" between the Board and Lend Lease when repairs needed to be made in accordance with the warranties. Def.'s SMF ¶ 40. In so doing, Mr. Berry testified that he sometimes acted on behalf of 1441 LLC and at other times acted on behalf of the Board. *Id.* Indeed, even in 2009 – several years after 1441 LLC had been dissolved – Mr. Berry continued to communicate with Lend Lease and its subcontractors on behalf of both the Board and 1441 LLC. *Id.* ¶¶ 49-50.

Within one year of completion of construction, three leaks were found in the building. *Id.* ¶ 41. In each of those instances, Mr. Berry requested repairs in accordance with the warranties assigned to or purchased by 1441 LLC, and Lend Lease agreed to coordinate and oversee the repair work done by its subcontractors. *Id.* ¶ 42. In each instance, neither 1441 LLC nor the Association paid for any of the repair work. *Id.* Likewise, when additional repair work was required in 2005 and 2006 with respect to water heaters and water pumps, Mr. Berry contacted Lend Lease and its subcontractors who addressed the problems in accordance with the extended warranties purchased by 1441 LLC. *Id.* ¶¶ 43-46.

In January 2014, a water sprinkler line burst on the property, allegedly causing water to flow into multiple units

and the common area. *See* Complaint ¶¶ 7-11. According to an
engineer hired by Philadelphia Indemnity to examine the site,
the water intrusion stemmed "from inadequate insulation
surrounding the sprinkler system pipe and/or other protective
devices to maintain the temperature above freezing." *Id.* ¶ 9. As
a result of the burst pipe, the Association incurred losses in
the amount of $107,552.74, which were paid by Philadelphia
Indemnity. *Id.* ¶ 11.

### E.    The Instant Action

Philadelphia Indemnity filed suit for breach of contract
and negligence against Lend Lease in D.C. Superior Court on
April 20, 2015. *See* Compl., ECF No. 1-2.[4] Lend Lease removed the
action to this Court and moved for judgment on the pleadings,
asserting that Philadelphia Indemnity's negligence claim was
barred by the waiver-of-subrogation clause in the construction
contract entered into by Fairfield and Lend Lease. *See* Notice of
Removal, ECF No. 1; *Philadelphia Indem. Ins. Co. v. Lend Lease
(U.S.) Constr., Inc.*, 170 F. Supp. 3d 190 (D.D.C. 2016). The
Court denied Lend Lease's motion after finding that the record
was insufficient to determine whether the Association should be

---

[4]    Philadelphia Indemnity conceded that its contract claim
failed because it was "not a contracting party in this case."
*See Philadelphia Indem. Ins. Co. v. Lend Lease (U.S.) Constr.,
Inc.*, 170 F. Supp. 3d 190, 191 and n.1 (D.D.C. 2016).

deemed a successor of Fairfield and therefore bound by the construction contract. *Philadelphia Indem.*, 170 F. Supp. at 194. In particular, the Court noted that the record did not indicate:

> (1) when defendant completed construction; (2) when full payment was received; (3) whether the Association assumed any responsibility for payments to defendant; (4) when the Property passed from Fairfield to 1441 LLC; (5) when the property was conveyed to the Association; (6) what, if any, knowledge the entities who purchased the property from Fairfield had about the Contract; and (7) if there was any overlap in management between Fairfield and the Association.

*Id.*

The parties subsequently engaged in discovery limited to the question of whether the Association could be considered a successor of Fairfield. Lend Lease now moves for summary judgment, again arguing that Philadelphia Indemnity's action is barred by the waiver-of-subrogation clause because Philadelphia Indemnity's insured – the Association – is a successor of the first two owners of the building.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The "mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment"; rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to establish that a fact cannot be genuinely disputed, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted). Once the moving party meets its burden, the nonmoving party must come forward with specific facts that would present a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). A party asserting that a fact is "genuinely disputed" must support that assertion by "citing to particular parts of materials in the record" or "showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "If a party . . . fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e); *see also* Local Civ. R. 7(h).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor. *Anderson*, 477 U.S. 255. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (a non-moving party must show that "sufficient evidence supporting the claimed factual dispute" exists such that a jury or judge must "resolve the parties' differing versions of the truth at trial"). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. 251-52.

## III. ANALYSIS

The Contract's waiver-of-subrogation clause could bar Philadelphia Indemnity's claims resulting from the Association's losses only if the Association is deemed a successor of Fairfield, the original party to the Contract.

Lend Lease now asserts that, based on the discovery undertaken, there is no genuine dispute of material fact as to

whether the Association is a successor to Fairfield.

Specifically, Lend Lease argues that (1) 1441 LLC is a successor

or assignee of Fairfield; and (2) the Association is a successor

of 1441 LLC. Accordingly, Lend Lease claims that the Contract's

waiver-of-subrogation clause applies to the Association and bars

Philadelphia Indemnity's negligence claim. Philadelphia

Indemnity counters that its negligence claim is not governed by

the Contract's provisions and that, in any event, the

Association is not Fairfield's successor and therefore not bound

by the terms of the Contract.

   As set forth below, the Court finds that, while the

Contract's broad waiver-of-subrogation clause would encompass

negligence claims, genuine factual disputes preclude a

definitive finding as to whether 1441 LLC is a successor or

assignee of Fairfield based on the record created by the

parties. Moreover, because the Court finds that a genuine

dispute of material fact exists as to whether 1441 LLC is a

successor or assignee of Fairfield, the Court need not reach the

question of whether the Association is a successor of 1441 LLC.

Accordingly, the Court denies Lend Lease's motion for summary

judgment.

## A. The Waiver-of-Subrogation Clause Applies To Negligence Claims.

As a threshold matter, the parties dispute whether the waiver-of-subrogation clause applies to Philadelphia Indemnity's negligence claim at all.

In interpreting a contract, "Maryland adheres to the principle of the objective interpretation of contracts." *John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 326 (2010) (citations and internal quotation marks omitted).[5] A court's task in determining the meaning of a contract is necessarily "focused on the four corners of the agreement." *Id.* (citations and internal quotation marks omitted). "'When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used.'" *Id.* (quoting *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 167(2003)).

Two clauses in the Contract relate to subrogation actions.[6] First, the Contract contains a clause through which Lend Lease

---

[5]     Both parties apply Maryland law to plaintiff's claims, and defendant expressly acknowledges that Maryland law applies pursuant to the terms of the Standard Agreement. See Standard Agreement § 14.6.2 (the Contract "shall be construed under the laws of the State of Maryland"). Accordingly, the Court shall apply Maryland contract law in resolving defendant's motion.

[6]     "'Subrogation' . . . is defined as '[t]he substitution of one party for another whose debt the party pays, entitling the

and the "Owner" of the property agree to "waive all rights" for

losses that are otherwise covered by insurance:

> The Owner and Contractor waive all rights
> against (1) each other and any of their
> subcontractors, sub-subcontractors, agents
> and employees, each of the other . . . for
> damages caused by fire or other causes of loss
> to the extent covered by property insurance .
> . . .

General Conditions Contract ¶ 11.4.7. Second, another clause

extends this waiver to losses covered by insurance policies

purchased after the completion of construction:

> if after final payment property insurance is
> to be provided on the completed Project
> through a policy or policies other than those
> insuring the Project during the construction
> period, the Owner shall waive all rights in
> accordance with the terms of Subparagraph
> 11.4.7 for damages caused by fire or other
> causes of loss covered by this separate
> property insurance.

General Conditions Contract ¶ 11.4.5.

Lend Lease argues that the subrogation waiver in Article

11.4.5 bars Philadelphia Indemnity's negligence claim because

"(i) at the time of the incident, the property was insured

through a policy obtained by the Association that is separate

---

paying party to rights, remedies, or securities that would
otherwise belong to the debtor.'" *John L. Mattingly Const. Co.
v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 318 (2010)
(quoting Black's Law Dictionary 1563-64 (9th ed. 2009)). "In the
insurance context, [a]n insurer asserting a subrogation right is
usually viewed as 'standing in the shoes' of the insured so that
the insurer's rights are equal to, but no greater than, those of
the insured." *Id.* (citation and internal quotation marks
omitted).

from the policy obtained by Lend Lease that was in place during the project from 2002 through 2004 and (ii) the water leak is a 'cause of loss' covered under the Association's policy." Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 16-17, ECF No. 22.

Philadelphia Indemnity responds that "regardless of the contractual status of the parties," the subrogation waiver here does not encompass its negligence claim. Pl.s Opp. at 14. In support of this argument, Philadelphia Indemnity relies on *Community Association Underwriters of America v. Rhodes Development Group, Inc.*, 488 Fed. Appx. 547 (3d Cir. 2012), in which the Court of Appeals for the Third Circuit held that the waiver-of-subrogation clause did not preclude the insurer's subrogation claims premised on defendants' alleged negligence.

Philadelphia Indemnity's reliance on *Rhodes* is misplaced. There is no indication that the contract at issue in *Rhodes* contained a "successors and assigns" clause; rather, the defendant claimed that the plaintiff insurance company, who was the subrogee of the condominium association, was an intended ***third-party beneficiary*** of the construction contract and therefore bound by the waiver-of-subrogation provision. 488 Fed. Appx. at 549-50. Under established Third Circuit law, the court found that the waiver-of-subrogation clause could only apply to the association to the extent the association's claims arose

from its third-party status – i.e., to the extent the association asserted contractual claims. *Id.*

Here, Lend Lease does not argue that the Association is a third-party beneficiary, but rather, a contractual party pursuant to the "successor and assigns" clause. *See* Def's Reply at 7, ECF No. 24. Moreover, the plain language of the Contract makes clear that the waiver-of-subrogation clause extends more broadly than to just contractual claims: "The Owner and Contractor waive **all rights** . . . for **damages caused by fire or other causes of loss** to the extent covered by property insurance[.]" General Conditions Contract § 11.4.7 (emphasis added). Other courts have found that similar clauses bar all claims, including negligence claims, made in connection with a covered loss. *See, e.g.*, *S.C. Nestel, Inc. v. Future Const., Inc.*, 836 N.E.2d 445, 448, 451 (Ind. Ct. App. 2005) (contract in which parties agreed to "waive all rights against each other . . . for damages caused by fire or other perils to the extent covered by property insurance" barred recovery regardless of "whether the theory of recovery [wa]s negligence or breach of contract"); *Town of Silverton v. Phoenix Heat Source Sys., Inc.*, 948 P.2d 9, 11, 13 (Colo. App. 1997) (rejecting argument that subrogation-of-waiver clause that applied to "all rights . . . for damages caused by fire or other perils to the extent covered

by property insurance" did not bar product-liability causes of action).

Consequently, if the Association is deemed to be a successor to Fairfield, Philadelphia Indemnity's negligence claim would be barred because the loss it suffered was covered by property insurance it provided. *See* Compl. ¶ 11 (alleging that Philadelphia Indemnity paid the Association "for the losses it suffered from the flood").

> **B.  Genuine Disputes Of Material Fact Exists As To Whether 1441 LLC Is A Successor to or Assignee of Fairfield.**

Given that plaintiff's negligence claim is encompassed by the waiver-of-subrogation clause, the Court must next decide whether 1441 LLC is a successor to or assignee of Fairfield and, if so, whether the Association is a successor to 1441 LLC.

Under Maryland law, a "successor" in the non-labor contractual context is defined as "one who takes the place that another has left, and sustains the like part or character." *Safer v. Perper*, 569 F.2d 87, 95 (D.C. Cir. 1977) (citation and internal quotation marks omitted). *See also Crown Oil & Wax Co. of Delaware v. Glen Const. Co. of Virginia*, 320 Md. 546, 563-64 (1990) (adopting the formulation of "successor" set forth by the *Safer* court). Whether an entity is a successor of another is a case-by-case fact-oriented determination. *Safer*, 569 F.2d at 264. As this Court explained in its March 18 Order, the factors

to be considered in determining successorship are: (1) the
nature of the relationship between the original contracting
party and the new owner; (2) whether there was any overlap
between the two entities; and (3) whether the original party's
obligations were completely discharged prior to the successor
assuming interest in the property. *Philadelphia Indem.*, 170 F.
Supp. 3d at 193 (citing *Safer*, 569 F.2d at 95).

Likewise, an "assignee" is defined as an entity to which
"an assignment has been made . . . by the party having the
right." Black's Law Dictionary. An "assignment generally
operates to transfer to the assignee all of the right, title and
interest of the assignor in the subject of the assignment and
does not confer upon the assignee any greater right than the
right possessed by the assignor." *James v. Goldberg*, 256 Md.
520, 527 (1970). Moreover, "an assignee must expressly assume"
any correlative duties or burdens with the rights assigned in
order to be liable for such duties or burdens. *See Pumphrey v.
Kehoe*, 261 Md. 496, 506 (1971); *P/T Ltd. II v. Friendly Mobile
Manor, Inc.*, 79 Md. App. 227, 234 (Md. Ct. App. 1989).

To establish that the Association is a successor to
Fairfield, Lend Lease must first show that 1441 LLC – the
developer that purchased the building from Fairfield – is a
successor to or assignee of Fairfield. Lend Lease asserts that
1441 LLC is a successor to or assignee of Fairfield because 1441

LLC took a series of actions "that Fairfield would have or could have taken had it remained the owner." Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 10, ECF No. 22. In particular, Lend Lease points to (1) 1441 LLC's involvement in the property prior to the completion of construction; and (2) the assignment of warranties to 1441 LLC, 1441 LLC's purchase of extended warranties, and 1441 LLC's claims under those warranties. *Id.* at 10-12.

Philadelphia Indemnity disputes that 1441 LLC's involvement with the building prior to the completion of construction has any "bearing" on the issue of whether 1441 LLC is a successor to Fairfield. Pl.'s Opp. at 5, 10-12. Plaintiff further adds that Lend Lease "places far too much emphasis on 1441 LLC and/or the Association invoking [warranty] rights they were specifically assigned and/or purchased." *Id.* at 12. The Court examines each argument in turn.

> **(1) A Genuine Dispute Of Material Fact Exists As To Whether 1441 LLC's Involvement In The Property Prior To The Completion Of Construction Renders It A Successor.**

The parties agree that 1441 LLC became involved in the property prior to the completion of construction, *see* Def.'s SMF ¶¶ 8, 32 and Pl.'s Opp. at 6, but dispute the extent of that involvement and whether it took Fairfield's place and sustained its "like part of character." According to Philadelphia

Indemnity, even after 1441 LLC executed the Purchase and Sales
Agreement with Fairfield in September 2003, its "rights" were
"limited." Pl.'s Opp. at 10. Mr. Berry explained that 1441 LLC
was only "reluctantly given" permission to participate in the
punch-list process and attend inspections. Pl.'s Berry Dep.
107:3-7. Moreover, 1441 LLC "could not request any structural or
lay out changes in the construction process." Pl.'s Opp. at 10.
Indeed, Mr. Berry testified that, during this period, 1441 LLC
had limited authority to make any significant changes to the
property at all:

> Q:   [S]o In the time frame between when you
>      – you and your partners – or members
>      decide: All right, we're going – we're
>      looking at this building, to the point
>      that you actually purchased the building,
>      did you guys have any ability or
>      authority to request construction change
>      orders from Lend Lease?
>
> A:   Officially, I – well, here, here's what
>      we had permission to do: We had
>      permission to observe the final finishes
>      and to do punch lists. That, at first,
>      was reluctantly given, but it was – it
>      was given. . . . We insisted on things
>      but it didn't necessarily happen. It was
>      cleaned up buy it didn't – we had
>      problems with the countertops and we had
>      problems with the hardwood flooring. They
>      did – without changing anything out, they
>      did the best to clean things up.
>
> Q:   So my question though, is: During this
>      period when, you know, you've decided to
>      buy the building and before you actually
>      purchased the building, could – did you
>      have the authority and the ability to go

to Lend Lease and say, "Hey, look, you
know, we want to change, you know, the
floor design on Floor 9, and we want to
turn it into eight units as opposed to 12
units?" Did you have the authority and
ability to do that?

A:      My partner – one of my partners, Enrico
Plati, who has an architectural degree
from Italy, wanted to do exactly that.
And short of telling us to hand it on our
nose, there was no way that was going to
happen.

Pl.'s Berry Dep. 106:19-108:17.

Philadelphia Indemnity's insistence that this testimony

shows that 1441 LLC had "limited" rights as compared to

Fairfield with respect to the property – and therefore did not

"sustain the like part or character" as Fairfield after its

purchase – is further buttressed by the fact that Fairfield, and

not 1441 LLC, signed the final change order and negotiated the

final contract price. *See* Def.'s Mot. for Summ. J. Ex. O (change

order reflecting Fairfield as the "owner" of the property that

was signed on May 3, 2004), ECF No. 22-17; O'Grodnick Dep. 22:2-

23:18 (Lend Lease employee explaining that the change order

reflected the "final amount that's due" and "final completion

date" for the project "based on a negotiated settlement of the

owner contract").

On the other hand, evidence also shows that 1441 LLC became

extensively involved in the final stages of construction by

carefully inspecting each unit jointly with Fairfield prior to

accepting Lend Lease's work and requesting that "issues with the
garage, HVAC, plumbing, and landscaping" be addressed. Def.'s
SMF ¶¶ 11-22. Mr. Berry testified that 1441 LLC took "a more
active role" in the inspection process than the actual owner
Fairfield, and he suggested that Fairfield representatives only
attended the inspections to "cover themselves." Def.'s Mot. Ex.
F, Deposition of Robert Berry ("Def.'s Berry Dep.") 22:15-21,
23:14-23, ECF No. 22-8. Because the parties have put forward
conflicting evidence as to 1441 LLC's involvement in the
property prior to the discharge of Lend Lease's obligations
under the Contract, the Court finds that genuine disputes of
material fact exist as to the nature of the relationship between
Fairfield and 1441 LLC and the overlap between the two.

### (2) A Genuine Dispute Of Material Fact Exists As To Whether 1441 LLC's Receipt of Warranty Rights Renders It A Successor or Assignee.

Likewise, whether 1441 LLC's receipt of warranties from
both Lend Lease and its subcontractors – and 1441's subsequent
claims under those warranties – is sufficient to render 1441 LLC
a successor to or assignee of Fairfield is also genuinely
disputed. For example, Philadelphia Indemnity argues that the
warranties were assigned by Fairfield to 1441 LLC through the
Assignment Agreement. Pl.'s Opp. at 11. The Assignment Agreement
– which is not fully executed – purports to limit the rights and
obligations assigned by Fairfield to 1441 LLC under the

Contract. *See* Pl.'s Opp. at 11-12; Def.'s Mot. for Summ. J. Ex.
E, Assignment Agreement, ECF No. 22-7. Specifically, the
Assignment Agreement provides that the assignee – i.e., 1441 LLC
– "shall have **no contractual or other obligations or liability
to [Lend Lease] under the Contract or otherwise** . . . and
Contractor shall look solely to [Fairfield] for any such
obligations or liabilities." *Id.* (emphasis added). The parties
dispute the significance of this agreement. *Compare* Pl.'s Opp.
at 12 (arguing that the language in the assignment agreement
"demonstrates an understanding among the parties that unless
specifically assigned in writing, the terms of the construction
contract remain between Fairfield and Defendant"), *with* Def.'s
Reply in Supp. of Mot. for Summ. J. at 6 ("Because the
assignment is unexecuted, there thus exists no evidence showing
Fairfield and 1441 LLC intended to move forward with the limited
assignment of contractual rights[.]"), ECF No. 24.

Defendant, on the other hand, argues that the warranty
rights were passed from 1441 LLC to Fairfield through the Public
Offering Statement issued in connection with the formation of
condominiums and signed by Mr. Berry. Def.'s Mem. at 12-13. The
Public Offering Statement includes a provision indicating that
1441 LLC is the "successor" to Fairfield and, "[u]pon its
acquisition of the Property . . . was **assigned and assumed all
of the rights and obligations of Fairfield."** Def.'s SMF ¶ 26

(emphasis added); Def.'s Mot. Ex. K at 1-2, ECF No. 22-13.
Plaintiff suggests that this language should be interpreted to
refer only to 1441 LLC's acquisition of Fairfield's "property
ownership rights" – and not "any rights and obligations
Fairfield ha[d] under any contract in existence." Pl.'s Opp. at
12.

The source of 1441 LLC's warranty rights – and whether 1441
LLC also assumed the obligations set forth in the Contract
creating the warranties – is genuinely disputed. Although the
Assignment Agreement attached to Lend Lease's motion is not
signed by Fairfield or 1441 LLC, the mere fact that the
agreement is unexecuted does not make it invalid *per se*. *See,
e.g.*, *Porter v. Gen. Boiler Casing Co.*, 284 Md. 402, 410, 396
A.2d 1090, 1095 (1979) (under Maryland law, the mere fact that a
contract is unsigned does not render is unenforceable,
particularly where the parties have demonstrated "mutuality of
assent" through their conduct to be bound by the contract's
terms). Instead, it requires the Court to evaluate the parties'
conduct to determine whether they intended to be bound by the
Contract's terms. Lend Lease argues that the language in the
Assignment Agreement is contradicted by the language in the
signed Public Offering Statement. Def.'s Mem. at 13. But Lend
Lease does not point to any evidence – other than the fact that
one document is signed and the other is not – conclusively

establishing that the parties intended for the terms set forth in the Public Offering Statement to govern. To the contrary, Mr. Berry testified that it was his understanding that "Fairfield . . . was selling [1441 LLC] the building and we were assuming any ***rights*** that they had." Def.'s Berry Dep. 34:3-7 (emphasis added). As such, a factual dispute exists as to whether Fairfield and 1441 LLC intended to create an assignment of certain rights without also assigning the burdens associated with the Contract. The answer to this factual question is necessary to resolve whether 1441 LLC was Fairfield's successor. *See Am. Prop. Const. Co. v. Sprenger Lang Found.*, 768 F. Supp. 2d 198, 203 (D.D.C. 2011) (declining to grant summary judgment where genuine dispute of material fact remained as to whether the parties intended to be bound by the agreement at issue). [7]

---

[7]    Philadelphia Indemnity also asserts that the Association cannot be bound by the Contract because the Contract is not "a restrictive covenant that runs with the Property binding all subsequent owners of the Property." Pl.'s Opp. at 15. Because Lend Lease nowhere suggests that the Association is bound by a restrictive covenant, the Court does not address this argument.

## IV. CONCLUSION

For the reasons stated above, and as set forth in the previously filed Order, Lend Lease's motion for summary judgment is **DENIED**. The parties are directed to submit a joint status report including, *inter alia*, a recommendation for further proceedings by no later than **November 17, 2017**.

　　　　SO ORDERED.

Signed:　　Emmet G. Sullivan
　　　　　United States District Judge
　　　　　October 11, 2017